Good afternoon. Illinois Appellate Court, First District Court is now in session. The Sixth Division, Justice Mary Meek presiding. Case number 1-8-0-0-6, People v. Travis Gona. Thank you. Welcome to the lawyers. Thank you for attending the oral argument this afternoon via but the way we're going to proceed today is allow each side to talk for up to 10 minutes. If the appellate would like to reserve some of that 10 minutes, you may do so. And then we will, at the end of your 10 minutes before we reach the other side, stop for questions, beginning with Justice Connors and Justice Cunningham, then myself will ask you questions. That shouldn't go more than 10 minutes, but that time will not be charged to you, though we will ask you to address the questions and then proceed with rebuttal, and then we will take the matter under advisement. Does that make sense to both of you? Yes, Your Honor. Okay. All right. Mr. Dow, whenever you're ready to proceed. Thank you. Good afternoon. I think I'd like to reserve three minutes of my 10 for rebuttal, please. That would be fine. May it please the court. In this case, two jurors knew that the defendant's father was caught trying to hire a hitman to take out two witnesses against his son. The bottom line is that that fact, which was not in evidence, made my client, Travis Caguana, look guilty, and it was therefore prejudicial and requires a new trial. Now, there's no question that two of the jurors, at least two of the jurors, had this information. Both of them admitted under oath that they were aware of the murder for hire plot. The trial court specifically found that they had outside information regarding the defendant's attempt and or conviction to have the two state's witnesses killed. And so, because it's clear they had the outside information, the question really is, under the two-step framework, whether a new trial is required. Now, the first step of that framework is the defense initial burden of showing that the information relates directly to something at issue in the case. In other words, it has to show that the defense has to show that the information was of a nature that it could have influenced the verdict. Now, the trial court interpreted this to mean that it had to relate specifically to the defendant, and that's not quite what the case law requires. It only requires that it relate, the outside information relate to the issues in the case. And in this case, the key issue was identity. And as laid out in my briefs, this information went to identity because, again, it made Travis look guilty. And we know that because the case law says that when you have outside information about threats against witnesses, that creates the impression that defendant was the source of the threats and was motivated by a desire to conceal guilt. And that's when you don't even know who was responsible for the threats. Now, in this case, we know. We know that it was the defendant's own father. So, not only is the fact that there's a threat out there prejudicial, but because it's coming from his own dad, that makes it even more prejudicial. And that's what the Davis case that I cited in the reply brief says. Now, because it creates the impression that the defendant or, in this case, the defendant's father is motivated to conceal the defendant's guilt, that is probative of identity. And so, in the end, because the issue at trial was who was the shooter, and because this is the sort of thing, trying to kill witnesses is the sort of thing that a guilty person would do or the associates of a guilty person would do, the plot to have these witnesses killed implies that the answer to the key question at trial is the shooter was Travis. That gets us through step one of the framework. At this point, there's now a presumption of prejudice. Now, the state can rebut that presumption at the second step by showing that the outside information was harmless beyond a reasonable doubt. But as I pointed out in the reply brief, the state did not argue in its brief that it was forfeited. But even if it hadn't been, the nature of this information is such that it can't be harmless beyond a reasonable doubt. For that to be true, it has to be obvious that there was no prejudice. And when you get back to the fact that, again, the defendant's own father is trying to kill witnesses, and two jurors know that when they're not supposed to, you can't really say that it's obvious that there's no prejudice there. So I think the key issue, the key question is whether Travis met his burden at the first step of the two-step framework. And for the reasons I just summarized, we think he did. I'm going to briefly touch on the second issue. Just a couple of remarks. Basically, the first of the three sub-issues is determinative. And that's the fact that the trial court never made any kind of a determination that Travis was incorrigible or beyond rehabilitation or irretrievably depraved or anything of the sort. There's no question that Travis got a de facto life sentence. There's no question that that means that the Miller line of Illinois Supreme Court and Holman apply. And Holman says that you can't give a juvenile life sentence unless you make that determination of incorrigibility, which I'm using sort of a shorthand for that whole phrase. But it all gets to the same point, that you have to have somebody in front of you who you can tell, even as a teenager, has no hope for rehabilitation. And there's just nothing in the record indicating the trial court made that determination either explicitly or implicitly. And as I argued in the final argument of the brief, that wouldn't have been a reasonable finding anyway, because there was plenty of evidence that Travis was susceptible to rehabilitation. And the trial court, I don't think, found otherwise. So I think that ends my prepared remarks. And I'm happy to take any questions that the court has. Justice Connors, would you like to begin, please? Yeah. Counselor, what's the standard of review here on the court's finding? For the new trial? Right. It's an abuse of discretion. Right. So that's a pretty low standard, is it not? It is, Your Honor, but it's hard. Sitting here and looking at the nature of this information, it's hard to see how it could be reasonable to find that this is not the sort of thing that could have influenced the verdict. And there's also the fact that the court made an error of law. This is something I don't think I addressed in the reply brief, but in the opening brief, it pointed out that the trial court, it conceived the issue, conceived the case law as saying it has to be related to the defendant, as opposed to an issue in the case. And that's, like I said, that's not quite right. It has to be related to one of the issues in the case. In this instance, identity. So the fact that it wasn't specifically tied to Travis, it doesn't make a difference. Counselor, let me ask you this. Pursuant to People v. Collins, I believe it says this, the information is directly related to something at issue in the case. They talk about direct relationship, not some other frolic or whatever thing that someone else was doing. So the direct relation to whether or not this defendant was guilty or not guilty, I mean, the two witnesses have testified against him, right? Yes. Yeah. So that testimony stands. So you have to explain to me the direct relation that this, what this father did, again, is something that's at issue in this case. Sure. So when you're reading that language in Collins, I think it's important to which is that it, quote, may have influenced the verdict. And so when we say relates directly, I think what we're, what we're looking at is for something that actually has a bearing on some of the issues in the case. And in this case, that issue is identity. Because when you have somebody who's trying to kill the prosecution's witnesses against the defendant, that makes the defendant look guilty. And, you know, the defense here wasn't state of mind, or anything like that. It was who was the shooter? Was it Travis? Or was it one of the two witnesses who testified against him? Most likely see Michael Sierra. And because Travis is trying to have those two witnesses killed, or Travis's father is trying to have those two witnesses killed. It looks like he's trying to have those two witnesses killed. Because he knows he's guilty. Thank you. That'll be all. Thank you. Justice Cunningham. Do you have any questions? You are mute. You are mute. You're still muted. Oh. Justice Cunningham, you're mute. Yeah. Yeah. I was trying to unmute myself. Sorry. I have no questions. I have a couple questions. First of all, does it matter that one of the jurors was the foreman? Is that of any import? What matters is the nature of the information, Your Honor. So I think the answer is no. It's certainly troubling that the jury's foreman was aware of this and didn't bring it to the trial court's attention. But at the end of the day, even if it was one juror who was not the foreman, it would be the exact same problem. And you referenced cases in which there were information as to who was the source of those threats. What cases that I thought that the cases that you cited in the cases that you cited that defended himself was the source of the threats. But are there cases where we didn't know who the source was? The cases I cited are Crowder and Henderson. And unless I misunderstood something about those cases, what those what both courts said is when you have information about threats, that alone creates this impression that it must be the defendant who's behind them. And in this case, that impression is even stronger, of course, because we know that it's the defendant's own father who's behind the threats. So it's not a situation where, you know, maybe in some other case, you'd have somebody completely disconnected from the case, and you can tell it has nothing to do with the case, in which, in which case, it wouldn't be a problem. But here we have the defense own father doing it. So it's a problem. And then my last question goes to this notion that the state has somehow forfeited a showing of that there's no prejudice. I mean, the state makes a number of arguments that could go and I think are primarily directed to you not meeting your burden. But we could rely on those same arguments, could we not to find that there's been no prejudice, for example, that the jury was instructed to disregard anything other than the evidence and the other arguments that the state makes? Well, obviously, the court is forfeitures limitation on the parties. It's not a limitation on the court, right? So if the court wants to address harmless error, it can. But like I said before, I don't see how you could ever find that it's obvious that there was no prejudice. If the defense has met its initial burden. Because the in this case, yes, I'm sure in other cases, that might that might be true. Because there's it's duplicative, for example, but this was not duplicative information in any sense. That's correct. Okay. And you also mentioned one other thing about one of the one of the arguments, which was that the jury was instructed to base its verdict on the evidence. And I just would like to take the opportunity to point out, we know that this jury didn't necessarily honor its instructions. Because eight times, these two jurors who had this outside information were told they could not have the information, not that they couldn't use it. But that they could not have it. And there's nothing indicating that they ever brought this to the attention of the trial court during trial when it could have been fixed. Well, hold on a second. They were never instructed. If you've somehow gathered such information, please report it to the court. They were never instructed to do that. Correct. That's correct. And in fact, it appears that before the court had an opportunity to instruct them not to consult any outside information. These two jurors, in fact, had consulted outside information or had been given outside information. I maybe this is a distinction without a difference. But the the court did have the opportunity to instruct them not to do this at the end of jury selection. And as the court I think admitted it needed to tighten up its procedures. So they went home after jury selection and and they found this stuff out before they were told they were not allowed to have outside information about the case. Exactly. So so there was they actually got it before they were instructed. Got the information before they were specifically instructed. Yes, Your Honor. But at the same time, I think that a conscientious juror who hears that is going to say, oh, no, this might be a problem. I know something about the case because even though I didn't know I wasn't supposed to do that, especially in the case of David Rivers, who went and looked up the case on Google or. Instead of, you know, you know, he's maybe not necessarily at fault for doing it then, but once he finds out he's not supposed to have done it, he's not supposed to have that information, that is something that we would expect, I would expect a juror to bring to the court's attention. All right. And anything else from either of the justices? Yes, I do want I. Can you hear me? Yes. OK, Mr. Dowd, I think that there you say that this was a distinction without a difference. But I think that you're looking at this through the lens of a lawyer who understands courtroom procedures, isn't it conceivable or reasonable that the jurors before they had heard this instruction from the judge not to gather any outside information or talk to anybody about the case or talk to each other about the case, that they took that literally. And you're saying that any reasonable person would have told the judge that they came upon this information before they had gotten his instructions. Why do you say that? I mean, you're looking at it through your lens as a lawyer. Do you really believe that everybody who sits on a jury would do that? If you're a first time juror, for example? Well, I will admit that I've never served as a juror and my career has been spent practicing the appellate court. But if you have a situation where a jury is told you're not supposed to have outside information about the case, and we don't expect a juror to let the court know that maybe they do have that outside information once they hear that instruction, I guess that would be troubling for me. But at the end of the day, this particular argument, sub-argument, it doesn't really matter because these two jurors still have that outside information and they were not specifically instructed to disregard that. If they'd been specifically instructed, we might have a different case, although I would tend to think that this is the kind of information that would not be possible for a juror to completely disregard. But they weren't given an instruction to disregard this because the court wasn't aware that they knew about it. Okay. I have one other quick follow-up question. So your argument really boils down to there is a probability that this information influenced their verdict and therefore the outcome. So that alone is sufficient to make this grounds for a new trial. That's what I think your argument boils down to. Is that right? That's right, Your Honor. But it's not just my argument. It's what the case law says. But it's still your argument. Yes, I'm using the case law to argue my point. But this isn't something novel. But you're saying that these facts raise the probability that under these facts, the probability that the case law says must be met is there under these facts. That's what you're saying. Yes, absolutely, Your Honor. And I'm sorry, I think I misunderstood the question. Okay, got it. Okay, thank you. That's all for me. Thank you. And now we will hear from the state. Thank you. Good afternoon. May it please the court, my name is Assistant State's Attorney Sarah Gagarevich and I am speaking on behalf of the people. The most important thing to distinguish at this point in the beginning is what is an assumption and what is fact, what is found in the record. Judge Hill took great care in crafting language to alert these two jurors once he was made aware that they might have had extraneous information to bring them into court so that they were not coming in thinking that they were in trouble so that they would be coming in to be able to answer truthfully as to what they knew. What did they know? According to the record, Mr. Rivers knew that there was that he looked up a vague article on the internet. He could not say it was from the Chicago Tribune, which was an article that was presented to him and that the article he read involved the defendant's father and a federal case where the father was trying to harm witnesses and tried to hire somebody to kill a couple of guys who were getting called as witnesses. The record is silent as to whether Mr. Rivers knew whether or not the defendant's father was convicted, whether he was even arrested, and who these witnesses were. We are assuming that they are the two witnesses who identify his son, but that is still an assumption. In contrast, what did Ms. Jefferson know? She knew even less. She was having a conversation with her neighbor who mentioned, asked Ms. Jefferson what she had been doing, and Ms. Jefferson told her the name of the case, and her neighbor informed her that the defendant's father was involved in a contract murder for hire. Ms. Jefferson didn't even make the connection to the relocation. As this court is well aware, testimony regarding relocation expenses given to a witness by the state when the witness is testifying for the state is absolutely proper and necessary to show any potential bias. However, there's nothing to indicate that Ms. Jefferson forgot the information between the time she learned it and the time she testified, which is about five months between March and August of 2017. In fact, I think what's more probable and what is born out through the record is that the information was so inconsequential she didn't even think about it. She also never indicated that she knew the defendant's father had been convicted or had been arrested or the names of these witnesses. As has been brought up by Justice McFadden, the law does have a cure for this, and that is Illinois Pattern Instruction 1.01a, which is read at the beginning of trial after the jurors are sworn, and that instructs, among other things, for the jurors to not conduct any independent investigation. And then at the end of trial, 1.01, which, among other things, instructs the jurors not to take into consideration any evidence that was not properly admitted. That is the specific instruction that defense counsel says wasn't given. That is the specific instruction that tells a juror, if you heard something that was sustained, you cannot take that into consideration. And from all intents and purposes, from what the record shows, that is exactly what Mr. Rivers and Ms. Jefferson did. Mr. Rivers, in his testimony on his own, made a comment about the deliberations, and People v. Collins, while it is a second district case, does speak to that situation, indicating that the rule that prohibits going into the deliberation process and what is discussed is an evidentiary rule. When information about that topic does come out without an objection, it can be viewed as substantive evidence. And I would simply point out that on his own, Mr. Rivers indicated that this information was never part of the deliberative process. He was asked a follow-up question by the assistant state's attorney, but that was not objected to by the defense. This is a standard of abuse of discretion, and there is nothing to indicate that Judge Hill, in making his findings after hearing the witnesses and viewing all the evidence, was arbitrary or fanciful or unreasonable or where no reasonable person would take the same view. He was in the best position to make that determination. I would also note that, in terms of the assumption that the defendant's father's acts reflect directly on the defendant, we are assuming that the motive for Euripides Kaguana, the defendant's father, was to silence the two identifying witnesses. Again, making the assumption that those are witnesses he sought to have killed. However, another potential motive, again, an assumption, could be that this defendant and the two men in the car, the witnesses, were all part of the same gang. And these two witnesses, in testifying against their brother, perhaps committed a violation, and that this was in response to such a violation. Your Honors, I am not in any way trying to assume what the motive was. I'm simply pointing out we don't know what it was. I do believe counsel did touch upon the second issue regarding the sentencing. And I would like to move to that at this point. Again, this is a standard of abuse of discretion, where it's been very well settled in Illinois law that the trial court has the better opportunity to observe and to consider factors of credibility, demeanor, general moral character, mentality, social environment, habits, and age. And Judge Hill did that. Judge Hill considered this defendant's age, which was 17 at the time of the murder, and the attendant characteristics that go with such an age. And Judge Hill followed people v. Holman. And the record supports this. The judge, he used his discretion to add the discretionary 25-year firearm enhancement, as well as eventually sentencing the defendant to an aggregate term of 66 years. The factors of Holman are touched upon by Judge Hill. The defendant's age was noted by everyone, the assistant state's attorney, the defense attorney, and the judge, when he was making his ruling. Judge Hill acknowledged the defendant's family life, which is the second factor, noting that his parents were active in the defendant's life, and that the defendant made a statement in his PSI indicating that he had a good relationship with them. The third factor is the defendant's degree of participation, and he was the sole actor. He was the only person with a gun out. He's the only person that chose to fire that gun. He was not prodded by his two companions in the car, and the victims said nothing and did nothing prior to the defendant opening fire. The defendant's competence, or lack thereof, is the fourth factor, and there's nothing in the record to suggest that he was incapable or unable to communicate with his defense attorney, and was in any way unable to assist in the strategy for his trial. And the last factor, obviously, are the prospects for rehabilitation. Judge Hill knew that this defendant had one supervision in his juvenile background, and specifically stated that despite this defending having family support, he fired a gun at a group of unarmed African-American males, and the judge found it hard, and these are Judge Hill's words, that he found it hard to show much mitigation considering this defendant's home life. It is not that he did not take all the factors into consideration. It's that he did not find them to be substantial enough to outweigh all the aggravating factors. In imposing the sentence, Judge Hill used his discretion to add that 25-year firearm enhancement. That is an indication that Judge Hill thought about the total number of years that he was sentencing this defendant to. There was a discussion as to what charges were consecutive and what charges were concurrent, as well as the fact that the firearm enhancement, because defendant was a juvenile, was discretionary and not mandatory. Judge Hill clearly took into consideration all of the attendant characteristics of youth, all the factors of Holman, which reflect the Miller factors, and despite this defendant's criminal background and a good and supportive family, the judge found that this defendant got a gun, brought the gun into a car with him, fired it at unarmed African-American males in the middle of the afternoon in a residential area, that this defendant was not acting under duress, he was not acting impulsively, and there was no pressure from anyone for this defendant to fire upon those unarmed young boys. There's nothing to indicate an abuse of discretion, and for those reasons, I would ask that you deny the defendant's petitions. Thank you, counsel. Justice Connors? Counselor, on this issue of presumed prejudice, let's say for a moment, let's assume that this court agrees that prejudice is presumed and the burden that's suggested in Collins has been met, that this extraneous evidence was directly related to an issue in the case. Let's assume that for a moment. Is it true that then the burden shifts to the state to prove beyond a reasonable doubt that this was harmless? I'm not sure I can agree that it's proof beyond a reasonable doubt. It absolutely shifts to the state in order to show that the prejudice did not in any way, it's a rebuttable, that the prejudice could be rebutted, that while prejudice can exist, it doesn't necessarily mean that it caused unfairness to the defendant, and I do believe that even taking that assumption into place was borne out in the record. And tell me, what is in the record that rebuts the presumption that the state offered? That, as I had previously stated, all we have is that there was information given to these two jurors, and it was different and admitted so on the stand, but it clearly did not have an effect, and arguably he listened to the law and did not allow it, even if it was in his mind, to be a part of the deliberations. With Ms. Jefferson, she was not seeking the information. She just told her neighbor what she did that day, and her neighbor is the one that conveyed it, so her information, her not even making the connection at that time, I think is a very strong indicator that this was not prejudicial in her mind. It was a nothing. And again, being told not to take into consideration anything that is not proper evidence, I believe those two jurors followed that rule. Counsel, as far as what we consider about the jurors, it's not their actual thought process. It is the likely thought process, is it not? That is true, Judge. Excuse me, Justice. My apologies. All right. Thank you. That's all. Justice Cunningham, do you have any questions? Yes. Yes, I do. Counsel, you said that Mr. Rivers listened to the instructions and did not allow it to affect his verdict. How do we know that? I would argue that it is proper to take into consideration his response during the evidentiary hearing that the information was not part of the deliberations. Okay. But there is case law that says what the juror says in terms of whether it impacted his deliberations or not, that's not the end of the inquiry. So how do we know that? Simply because he said so? Is that what you're saying? Justice, I would argue that it is both what he said, because we can take that into consideration, but also the nature of the information. What he knew was that there was a federal case involving the defendant's father in a murder-for-hire plot. But again, contrary to the cases cited by the defense in his initial brief, those were cases where it was the defendant who was a part of the threats. Okay, but I'm just asking you in relation to this particular case. The main issue in the case was the identity of the shooter. And there were only two people who could finger that shooter, finger Kaguana as the shooter. And those were the two people who were cited for this murder-for-hire plot. And I don't think that the jurors who got this information were in any way fooled by the fact that 20 witnesses testified. Those 20 witnesses were inconsequential in terms of identifying the shooter. So I think it's reasonable for those two jurors to conclude it must be those two, because Sierra testified that, quote, he had to move and the state helped him with moving. So it seems to me that there is a link. And is there a link between the defendant, his father, and the issue at hand, which is the identity of the shooter? And I would like you to point me to something other than the fact that Mr. Rivers said it didn't affect him. And I think the female juror said that as well, but that's not the determining factor. Is there anything else that you can point me to that said that this did not affect their verdict? Well, Justice, I do believe that what the case law tells us to do is we have to basically guess, because we cannot get into the mind of the jury or into the deliberation process. However, what we have is the information, and the information is not damning in the same way that he says basically that the information is so damning because there's a link between the defendant and his parent. It's not like some random person on the street. It's the parent. And people can, or anybody else who reads that story, can reasonably assume that either the father was doing it because he thought his son was guilty or the son encouraged his father to do it. In any event, that link that we need, your opponent claims it's there simply because it's a father and son situation, and we're simply talking about identification witnesses, which is what the entire case turns on. Isn't that right? I mean, that's what your opponent says. And I'm just asking you, tell me something that in opposite to that, that in my mind rebuts that. Justice, I can only rely on what is in the record, which is that the witnesses were not named. It is an assumption that it is Sierra and Rios, and that there is no, nothing in the record to indicate that the defendant himself had anything to do with this plot. This could have been done completely on the father's own. That connection is missing. Okay. Thank you. I have nothing else, Justice Mikva. Thank you. Just following up on that last question of Justice Cunningham's, even if there was no connection directly to Travis, the fact that his father believed either that he was guilty or that the case against him was so strong that the witnesses needed to be killed could have an impact on the jurors' belief that he was the killer, or on the credibility of these two witnesses could not? Isn't there a connection there, even without a direct connection to Travis? I would argue that we would have to make a leap into that connection. We're making assumptions about the relationship between the defendant and his father, which from the PSI, we did learn about. But at the time that this was going on, we had no idea, and the jurors have no idea what kind of relationship the defendant has with his father. So, what the jurors, what the information that they had was focused on was a case that was not related to the defendant in the sense of the information was not about the defendant's case. It was the father, and it was a murder for hire. Without further information, just the fact that it is a father and son connection does not rise to prejudice that absolutely requires reversal. Judge Hill, I believe, properly held an evidentiary hearing to flush out this information, and in flushing this out and in hearing the juror's testimony and having sat through the trial and everything that came before and after, he made a decision which does not appear to be an abuse of discretion. Okay. Well, you rightly say that the defendant's argument rests in part on making the leap or making the assumptions, but how do we do this analysis, decide what the jury must have thought or may have thought? How do we do that other than by making assumptions? Since we can't make a direct inquiry, and Judge Hill couldn't make a direct inquiry into, jury, what were you thinking? We have to do it based on reasonable assumptions of what a reasonable juror would have thought, don't we? I would agree with you, Justice. However, assumptions can run the gamut. There are the assumptions being made by defense counsel, and then there are the assumptions that I proffered as possibilities. So really, your argument is that his assumptions aren't reasonable or aren't probable. It's not that we don't have to make assumptions because we do. It's just what's the reasonable assumption under these facts? Yes, Judge, in looking at the record. Okay. And then going to abuse of discretion standard, if in fact the analysis that the judge used was wrong, then it's not an abuse of discretion standard. Isn't that correct? If it's a legal error in what question he was supposed to decide, then our review is de novo. Is that correct? Yes, I would agree with that, Judge. However, obviously, I'm not conceding that point. I understand. My apologies. I'm sorry. I'm a trial attorney. My apologies. I mean, no disrespect with Judge, but Justice. You're doing fine. It was said right on the brief that you've gotten dragooned into doing appellate work in the pandemic. So happy for the opportunity. Then I have one last question on the sentencing. Everything you said about sentencing is, I think, 100% correct generally on sentencing. Abuse of discretion. Did they look at the right factors? But in this particular sentence, we're dealing with a life sentence in a juvenile on which there's a constitutional prohibition on a life sentence except in specific kinds of circumstances. Correct? Yes, Judge. Justice. Okay. And where is the record to support, to demonstrate any kind of finding by the trial court that this particular juvenile was that kind of juvenile as to whom a life sentence was not unconstitutional? Justice, there is no specific information. Judge Hill did not make particular findings as to the however, I do not believe or the law is supporting that you do not need to use specific language to make such a finding. Judge Hill did make a finding taking into consideration all the factors of Holman. And there's my position, or I believe that the record does support that he did take all those factors into consideration and by doing so made that finding that this is one of those sentences appropriate within his discretion. Of course, when he made this, when he imposed the sentence, it was before buffer. So he didn't know he was imposing a de facto life sentence, correct? Correct. However, I would argue that case law certainly has been applied that when new cases come through with Miller and all its progeny, there have been cases which were determined prior to those rulings where the sentencing has been appropriate despite it prior to that set of law. Okay. Any other questions from either of the justices for the state? All right. None for me. Thank you for your time. Counsel, you may proceed. Thank you, Your Honor. One thing we do not have to assume about the we can be found in the trial court's finding at the end of the hearing. Court said, quote, it is clear that they had outside information regarding defendant's father's attempt and or conviction to have the two states witnesses killed. That in and of itself is more than enough to cause the prejudice that we're arguing happened here. I'd like to address briefly the evidentiary question. I think I just have two points I'd like to make. The first point, and this has to do with jurors testifying about the deliberation process. First point is that the trial court actually said the law said it wasn't to consider. So regardless of what came out of the hearing, the trial court, correctly, I think, was disregarding that to the extent it was being to prove the deliberative process. And this is not merely an evidentiary rule. It is an articulation. It's something we're in service of a larger principle, which is that as a general matter, we don't like asking jurors about their verdict. And so when you have a situation about the jury learned something, it's okay to find out what it was they knew. But the deliberation process itself is sacrosanct. It can't be questioned, and we're not supposed to ask jurors about it for that reason. Just a couple of points with regard to Miller. The trial court did find that there wasn't much in terms of mitigation and that other things might have outweighed it. But that's not the report had to make for the sentence to be constitutional. And there's nothing in the record. And it's not even clear that the court even realized that it could not impose the sentence unless it thought that Travis was the rare juvenile offender who was beyond rehabilitation. And finally, sorry, I'm jumping around a little bit. But going back to the first issue and the question of harmless or harmless beyond a reasonable doubt, the standard is harmless beyond a reasonable doubt. And the reason is that this ultimately goes to constitutional rights, the right to confront witnesses, and the right to be found guilty based entirely on the evidence and not something outside of the evidence. Now, in the only Supreme Court in thorough says, and we know that constitutional errors are reviewed for harmless beyond a reasonable doubt. No Illinois court that I'm aware of has decided this particular issue. But we did cite a case in the 11th Circuit United States versus Siegelman, where they applied the harmless beyond a reasonable doubt standard. And that's all I have, unless the court has any more questions for me. Do either of the justices have any questions? Justice Congress? Good question. Counselor, if what you say is true, as far as getting the testimony from the they believed or didn't believe, how can the state ever possibly carry its burden? As far as the beyond a reasonable doubt, if that's the burden? When it's the it's presumed, I mean, how can they possibly what would they what possible evidence could they put on ever? Well, I would certainly agree that it's quite hard to overcome. Once the defendant has made out that initial burden, but it isn't impossible. There are you can you can come up with hypothetical situations where it would be obvious that whatever the outside information was wouldn't have affected the verdict at all. For example, if there were overwhelming evidence of the defendant's guilt, if you had five witnesses, all of them beyond reproach testifying, yeah, the defendant did it, then that would probably be harmless beyond a reasonable doubt. Obviously, we don't have that here. We have two witnesses, witnesses, the jury was specifically instructed to be skeptical of because they were potential co conspirators or accomplices in the shooting. So that would be but that would be one example of a situation where the state would be able to carry its burden of proving it was harmless under reasonable doubt. Thank you. That's all. All right. I have no questions. I think everyone's covered everything. Right. You both did a terrific job. Thank you both. And we will take this matter under advisement. Court is adjourned.